**SOUTHERN PAC. CO. v. EDWARDS, Collector of Internal Revenue.**

District Court, S. D. New York.

April 12, 1932.

Ben C. Dey, of Portland, Or., and George L. Buland and Charles L. Minor, both of New York City, for plaintiff.

George Z. Medalie, U. S. Atty., of New York City (Samuel C. Coleman and Frank Chambers, both of New York City, and Lionel A. Norman, of Washington, D. C., of counsel), for defendant.

FRANK J. COLEMAN, District Judge.

The two questions presented are purely legal and arise in the computation of the plaintiff's excess profits tax for the year 1917. They are (1) what valuation should be allowed for certain land in determining the amount of invested capital, and (2) what effect should be given in a consolidated return to the fact that the land was transferred from one affiliate to another.

The plaintiff had two subsidiary corporations, Southern Pacific Railway Company and the Southern Pacific Land Company, of which it owned the entire capital stocks, except directors' qualifying shares. The plaintiff completely controlled the policies of the two subsidiaries, and all the officers and principal employees of the subsidiaries were also officers and employees of the plaintiff. The subsidiaries had no bank accounts, and all their expenses were paid by the plaintiff. Their books of account were kept in the plaintiff's office and were under the latter's supervision and control. The three companies, however, strictly followed the formal corporate procedure to keep their entities distinct from each other by holding regular stockholders' and directors' meetings, elections of directors and officers, etc., and by keeping separate books of account showing their intercorporate liabilities and relations.

In or about 1866 the federal government donated to the railroad company over four million acres of land which remained in its name until 1912 when the plaintiff caused the other subsidiary, the land company, to be formed for the purpose of taking title from the railroad company. At that time the land had a market value of $50,000,792, which was generally recognized by all concerned, but the formal contract of sale between the two subsidiaries fixed the selling price at $4,060,-000, which was the amount of a mortgage upon it. This sum was actually paid by the land company out of funds supplied by the plaintiff, but the money was not received by the railroad company. It was paid indirectly to the holders of the mortgage, and the railroad company received none of it for its equity in the land. The entire transaction was

carried out with strictest formality upon regular resolutions of the respective boards of directors, etc., just as though the parties were not affiliated.

The plaintiff had subscribed to the entire capital stock of the land company, $5,000,000, except for the directors' qualifying shares, and ultimately paid this amount by a transfer of other property and by a credit. Here, also, strict corporate formality was followed.

The first question presented is whether, in determining the amount of the land company's "invested capital," under the Revenue Act of October 3, 1917, § 207 (40 Stat. 306), and the regulations of the Treasury Department, the land should be valued at $50,000,-792, as claimed by the plaintiff, or at $4,060,-000, as claimed by the government. That section reads as follows:

"Sec. 207. That as used in this title, the term 'invested capital' for any year means the average invested capital for the year, as defined and limited in this title, averaged monthly.

"As used in this title 'invested capital' does not include stocks, bonds (other than obligations of the United States), or other assets, the income from which is not subject to the tax imposed by this title, nor money or other property borrowed, and means, subject to the above limitations:

"(a) In the case of a corporation or partnership: (1) Actual cash paid in, (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation or partnership, at the time of such payment (but in case such tangible property was paid in prior to January first, nineteen hundred and fourteen, the actual cash value of such property as of January first, nineteen hundred and fourteen, but in no case to exceed the par value of the original stock or shares specifically issued therefor), and (3) paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year. * * *"

The Treasury Department Regulations 41, article 63, which is applicable to this section provides:

"Art. 63. When tangible property may be included in surplus.—Where it can be shown by evidence satisfactory to the Commissioner of Internal Revenue that tangible property has been conveyed to a corporation or partnership by gift or at a value, accurately ascertainable or definitely known as at the date of conveyance, clearly and substantially in excess of the cash or the par value of the stock or shares paid therefor, then the amount of the excess shall be deemed to be paid-in surplus. The adopted value shall not cover mineral deposits or other properties discovered or developed after the date of conveyance, but shall be confined to the value accurately ascertainable or definitely known at that time.

"Evidence tending to support a claim for a paid-in surplus under these circumstances must be as of the date of conveyance, and may consist, among other things, of (1) an appraisal of the property of disinterested authorities, (2) the assessed value in the case of real estate, and (3) the market price in excess of the par value of the stock or shares."

The plaintiff contends that the difference between what the land company paid and what the property was recognized to be worth, amounting to $45,940,792, was a "paid-in * * * surplus," which should be included in fixing the amount of that company's "invested capital." It is apparent that the transaction between the subsidiaries was practically a donation to the land company of the railroad company's huge equity in the land, but there was no change in the ultimate beneficial ownership, because the plaintiff owned all the capital stock of both subsidiaries. There is no contention that the transaction should be deemed to have been made in consideration for the issuance of the land company's stock to the plaintiff; the latter's subscription was otherwise paid in full. But it should be recognized that the transfer was made at the instance of the plaintiff and to serve its own best interests, and that the railroad company derived no benefit from it except that the mortgage of $4,060,000, which covered all the railroad company's other property as well as the conveyed land, was paid.

Unquestionably the donation of the equity in the land gave rise in a purely economic sense to a surplus in the land company, because it was an asset over and above the sum of the company's liabilities and capital stock. Furthermore, that was the specific intention of all who participated. The government contends, however, that it cannot be included in the company's "invested capital" because it was not "paid in" by a stockholder. This raises the double question whether the statute and departmental regulation required that the surplus be paid in by a stockholder, and, if so, whether the donation here was not really by the plaintiff, though in form by the railroad company.

Neither the statute nor the regulation ap-

plicable to it contained any such express requirement, and, in determining whether it was implied, regard should be had for the underlying purposes of Congress. It was sought to levy an additional tax upon the abnormal profits arising directly or indirectly from the Great War, that is, upon those profits which caused an abnormally large rate of return on the capital employed. In the assessment of the tax it would, of course, become necessary to determine accurately the amount of the capital employed in the making of the profit, but theoretically the source of the capital was immaterial. For reasons of practical expediency, Congress either expressly or impliedly prescribed certain rules for determining the amount of capital employed in making the profits which were to be taxed. In regard to tangible property, the general idea was to fix its value as of the date when acquired, and, if this could be definitely ascertained, it would be entirely consistent with the underlying purpose to disregard the source of it. Furthermore, if it was acquired by ordinary purchase, the price paid, rather than the actual value of the property, was to be the measure of the capital invested; but, if it was acquired by contribution, its actual value at that time was to be taken.

In the present case, the government concedes that the tangible property, acquired by donation, though in form by purchase, could have been included at its actual value if the railroad company had been a stockholder, because then the surplus created would have been "paid-in" and the capital would have been "invested." There is no indication as to how much stock the railroad company should have owned in order to comply with this condition, and presumably one single share would have sufficed. It seems a little ridiculous that the ownership of a single share, which could have no relation to the purpose which Congress sought to accomplish, should nevertheless make a difference of over $46,000,000 in the valuation of the assets and of over $600,000 in the amount of the tax. It may well be that the words "paid-in" and "invested" would suggest a stockholder, because ordinarily only a stockholder donates a surplus to a business corporation; but it is difficult to believe that Congress intended to exclude all other donations because of the lack of one qualifying share of stock which could not possibly affect the economic considerations.

Furthermore, if stock ownership by the donor was necessary for a paid-in surplus, it seems plain to me that the donation in its essence was made by the plaintiff which was a stockholder, though in form by the railroad company. The plaintiff was the sole stockholder of the railroad company, was the beneficial owner of the land, and in real control of its disposition. The plaintiff, not only formally consented to the transfer by resolution of its board of directors, but actually procured it, and thus deprived itself of the right to share in it as a stockholder of the railroad company. Without the action of the plaintiff, the transfer could not have been made legally, and would not have been made actually. Unquestionably the plaintiff caused the surplus to be created in the land company, and the mere fact that it never had legal title to the land is immaterial. For the purposes of Congress it could have made no difference whatever that the land had not been first conveyed to the plaintiff and then transferred to the land company.

It is true that, if the land had remained in the railroad company, its value after the date of acquisition could not have been included in that company's invested capital; but that was because Congress for reasons of expediency saw fit to make the date of acquisition determinative in regard to tangible property not taken in payment for stock. That rule would not bar the land company from taking the stipulated value because there was a definite acquisition at that time. The fact that the transfer involved no change of beneficial ownership is of no consequence, because Congress intended that such transfers, if made before March 3, 1917, would have the same effect for valuation purposes as though there were a change of beneficial ownership (section 208 of Revenue Act of October 3, 1917 [40 Stat. 306]). There was here no attempt at tax evasion, and the transfer was made solely for the purpose of complying with a federal statute requiring the separation of a railroad company's property. It occurred five years before the date fixed by Congress for excluding transfers which did not involve change of ultimate control of the property.

The government does not seem to deny that the land company had an entity sufficiently distinct from that of the other corporations to make the date of transfer to it a proper date for evaluating the property if the surplus created was "paid-in"; but urges that by a parity of reasoning the railroad company must have had an entity distinct from that of the plaintiff which would prevent a ruling that the donation of surplus to the land company was really made by the plaintiff, though in form by the railroad com-

pany. It seems to me, however, that it is no impairment of corporate entity to recognize that the corporation is controlled by its stockholders. What the plaintiff contributed in the creation of the surplus in the land company was its control as stockholder of the railroad company and a sacrifice of its rights as such. This contribution, so far from being inconsistent with a separate entity in the railroad company, is in fact predicated upon it, and, on the other hand, is sufficient, I believe, to make the surplus created ·by it a surplus "paid-in" by the plaintiff, if, indeed, that was an implied requirement of the statute.

In considering the decisions cited by the government, it should be recognized that, merely because they speak of a "paid-in" surplus as one coming from stockholders, they do not necessarily intend to exclude all others. Ordinarily it is stockholders who donate a "paid-in" surplus, and it is natural to connect the two ideas without making one essential to the other. Furthermore, the rule that the actual price paid by a corporation for property purchased should be the measure of the capital invested has no application to this case, because here there was no real price paid, and the transaction was a donation of the equity in the land. Finally, even though a donation by an outsider may not be a paying in of surplus, if it is made without regard to the financial condition of the corporation, here it was made with the specific intention of contributing a surplus. With these considerations in mind, the cases cited by the government may be distinguished. La Belle Iron Works v. United States, 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998; Hotel Wisconsin Realty Co. v. Commissioner (C. C. A.) 47 F.(2d) 842; Kaufman & Baer Co. v. Heiner (D. C.) 34 F.(2d) 698; Oswego & Southern Railroad Co. v. Commissioner (C. C. A.) 29 F.(2d) 487; Consolidated Coke Co. v. Commissioner, 25 B. T. A. 345; Roanoke Mills Co. v. Commissioner, 18 B. T. A. 474; Frank Holton & Co. v. Commissioner, 10 B. T. A. 1317; A. C. F. Gasoline Co. v. Commissioner, 6 B. T. A. 1337.

█ Under all the circumstances it seems to me that, in the assessment of the excess profits tax on the land company, the invested capital should include the recognized actual value of the land as of the date when it was donated with the intention of contributing a surplus, and should not be restricted to a purely nominal purchase price which concededly had no relation to value. The only remaining question is whether the plaintiff is entitled to take the benefit of that valuation in a consolidated return which included the land company.

█ The original return filed by the plaintiff was a consolidated one and included the railroad company, but not the land company. In it the value of the land was not claimed as part of the invested capital of the affiliated group, but the $4,060,000 paid to the railroad company was included in the latter's earned surplus. Subsequently, the claim for refund included the land company as one of the affiliated corporations and set forth the value of the land as part of its surplus. The government concedes, however, that the effect was the same as though the original return had embodied the plaintiff's present contentions.

The plaintiff, which paid the tax for the affiliated group, cannot recover unless the valuation of the group's combined property is increased because of the transfer of the land in 1912. The government points out that there was no actual increase of the combined property by virtue of that transfer, and urges that a revaluation of the land company's invested capital should not affect the result. But, even if the transfer did not increase the combined property, it permitted a true valuation to be placed on it, and removed the artificial restrictions which would otherwise have prevented a statement of true value. It is true that, if the transfer had been made after March 3, 1917, no increase in the group's invested capital could have been allowed, but that was because of express statutory provision enacted, probably, to prevent tax evasion (Revenue Act of October 3, 1917, § 208). The fact that Congress directed that no effect be given to such transfer, if made after March 3, 1917, indicates an intention that it be effective if made prior. This theory was adopted by the department, and has been consistently followed. Law Opinion 1108 and Solicitor's Memorandum 3384 of Solicitor of Internal Revenue; Packard Motor Car Co. v. United States (Ct. Cl.) 39 F.(2d) 991. The government's present attempt to distinguish these rulings on the ground that the transactions there under consideration gave rise to taxable income to one of the affiliates is entirely groundless. It is impossible for me to see the slightest relevancy in that fact. The plaintiff is, therefore, entitled to the refund stipulated, and judgment is ordered accordingly.

It is appropriate that the court express appreciation of the exceptionally helpful briefs of counsel for both sides. Their in-

cisiveness, clarity, thoroughness, and accuracy deserve commendation.

Settle findings on notice.