## BROWN SHOE CO., INC. *v.* COMMISSIONER OF INTERNAL REVENUE.

No. 445.   Argued April 5, 1950.—Decided May 15, 1950.

*Charles B. McInnis* argued the cause for petitioner. With him on the brief was *Ernest M. Callomon.*

*Harry Marselli* argued the cause for respondent.   With him on the brief were *Solicitor General Perlman, Assistant Attorney General Caudle, Stanley M. Silverberg, Ellis N. Slack* and *Lee A. Jackson.*

584

Mr. Justice Clark delivered the opinion of the Court.

This proceeding seeks redetermination of petitioner's excess profits tax, computed by the invested capital method, for the fiscal years ended 1942 and 1943.[1] The issues arise from the payment of cash and the transfer of other property to petitioner by certain community groups as an inducement to the location or expansion of petitioner's factory operations in the communities. Petitioner claimed, and the Commissioner disallowed, (1) a deduction from gross income for depreciation on the property contributed and on the full cost of property acquired in part with contributed cash or equivalent funds, and (2) inclusion of the total value of the contributions in petitioner's equity invested capital. The Tax Court reversed the Commissioner's ruling in part. 10 T. C. 291 (1948). The Court of Appeals for the Eighth Circuit held with the Commissioner on all issues. 175 F. 2d 305 (1949). We granted certiorari, 338 U. S. 909 (1950), in view of an asserted conflict between the decision below and that of the Court of Appeals for the Third Circuit in *Commissioner* v. *McKay Products Corp.*, 178 F. 2d 639 (1949), reversing the Tax Court, 9 T. C. 1082 (1947).

Two questions must be determined: First, whether petitioner in computing its normal-tax net income, which is adjusted in determining excess profits net income, is entitled to deductions for depreciation with respect to property transferred to it from community groups or ac-

---

[1] The tax in controversy is imposed under the excess profits tax provisions of the Second Revenue Act of 1940, 54 Stat. 974, 975, as amended, I. R. C. § 710 *et seq.* The tax is levied upon excess profits net income remaining after allowance of a $5,000 specific exemption and an excess profits credit representing a normal profit. The Act permitted computation of the credit on the basis either of average income over a base period or of "invested capital," which includes equity invested capital and 50 percent of borrowed capital. The excess profits tax provisions of the Act were repealed in 1945. 59 Stat. 556, 568.

quired with cash to the extent received from such groups. Petitioner contends that the properties so acquired were depreciable as "gifts" under § 113 (a) (2) of the Internal Revenue Code or as "contributions to capital" under § 113 (a) (8) (B) or both; as to the properties acquired with cash it contends alternatively that they had "cost" to the taxpayer under § 113 (a).[2] Second, we must decide whether in computing petitioner's invested capital credit the aggregate value of the assets transferred by the community groups may be included in equity invested capital under § 718 (a) of the Code either as a "contribution to capital" or as "accumulated earnings and profits."[3]

---

[2] Section 23 (l) of the Code permits a deduction from gross income for depreciation of property, and § 23 (n) provides that the "basis" for depreciation shall be as provided in § 114, which adopts the "adjusted basis" provided in § 113 (b) for determining gain. This subsection in turn refers to § 113 (a), which provides that the "basis (unadjusted)" shall be the "cost" of the property, with certain exceptions including the following: § 113 (a) (2) provides in relevant part that "If the property was acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor or the last preceding owner by whom it was not acquired by gift . . . ."; § 113 (a) (8) provides that "If the property was acquired after December 31, 1920, by a corporation . . . (B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor . . . ."

[3] Section 718 (a) provided relevantly:

". . . The equity invested capital for any day of any taxable year . . . shall be the sum of the following amounts, reduced as provided in subsection (b)—

"(1) . . . Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital;

"(2) . . . Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. . . .

. . . . .

"(4) . . . The accumulated earnings and profits as of the beginning of such taxable year . . . ." 54 Stat. 974, 982, 26 U. S. C. (1940 ed.) § 718 (a) (1), (2), (4).

Petitioner is a New York corporation which at all times material conducted manufacturing operations in a number of plants located in Illinois, Indiana, Missouri and Tennessee. From 1914 to 1939 petitioner received in seventeen transactions an aggregate of $885,559.45 in cash and $85,471.56 in buildings[4] from various community groups in twelve towns. Except in one instance, each transfer was pursuant to a written contract between petitioner and the respective community group. The contracts were of three types: The first required petitioner to locate, construct and equip, or enlarge, a factory in the community, to operate the factory "continuously so long as it is practicable in the conduct of its business for at least a period of ten years," and to meet a minimum payroll, in consideration of which the community group agreed to transfer land and cash "to be used for the payment of suitable factory building or buildings"; in one instance existing buildings were also transferred and in another instance only buildings and no cash sum. Under this type of contract petitioner was obligated in the event of noncompliance to transfer the building back to the community group or to repay the sum. Under a second type of agreement petitioner in consideration of a cash payment undertook to enlarge an existing factory and to operate it for a period of ten years with a stipulated minimum addition to personnel. A third type of contract called only for the construction of an addition to petitioner's existing factory in consideration of a cash sum. Contracts of the latter type were in the nature of supplementary agreements with community groups and may have involved an obligation on the part of petitioner to continue operation of the additional plant facilities for the unexpired remainder of a period not

---

[4] The value of the land upon which the buildings were located was not included in petitioner's books and is unimportant for this proceeding.

exceeding ten years agreed upon in an earlier contract. No restriction was imposed in any instance as to the use which petitioner might make of the property contributed or acquired with cash, or of the proceeds if the property should be disposed of, after expiration of the required period of operation. The Tax Court assumed performance by petitioner according to the terms of the agreements, and the Court of Appeals did not differ. In the case of eleven contracts the stipulated period for performance had expired prior to the taxable years in question.

The single transaction which was not based upon such contractual obligations involved a $10,000 cash bonus paid in 1914, according to the minutes of petitioner's board of directors, "as a part of . . . organization expenses in starting the factory" in the particular town.

The cash sums received by petitioner from the groups were not earmarked for, or held intact and applied against, the plant acquisitions in the respective communities but were deposited in petitioner's general bank account from which were paid general operating expenses and the cost of all assets acquired, including factory buildings and equipment in the towns involved. The cash payments were debited to cash account on the assets side of petitioner's ledger and were credited to earned surplus either upon receipt or after having first been assigned to contributed surplus. The values of the buildings acquired were set up in a building account on the assets side and were credited to surplus.[5] In every instance the cash received by petitioner from a community group was less than the amount expended by it for the acquisition or construction of the local factory building and equipment.

In computing its normal tax net income for the taxable years in controversy petitioner deducted depreciation on

---

[5] Both courts below and the Commissioner have expressly assumed, as petitioner asserts, that the receipts of property and cash were not taxed as income.

the buildings transferred by the community groups and on the full cost of the buildings and equipment acquired or enlarged in the communities from which it had received cash. Petitioner also included the total of $971,031.01 in cash and other property in its equity invested capital.

The Commissioner disallowed depreciation deductions with respect to the buildings transferred (in the value of $85,471.56) and the properties acquired with cash to the extent paid to petitioner by the groups (in the value of $885,559.45).[6] In computing the amount of depreciation to be allowed, the Commissioner deducted that portion of the cost of the buildings, land and machinery which was paid with such contributed cash or equivalent funds.[7] The Commissioner in making such reductions allocated the cash contribution to each item, such as buildings, land if any had been purchased, and machinery in the proportion of the total cost of such item to the total cost of the project. The Commissioner also disallowed inclusion in equity invested capital of the total assets transferred, reducing such capital as computed by petitioner by $971,031.01.

The Tax Court reversed the Commissioner's disallowance of depreciation with respect to that portion of the acquisitions paid for with cash. It concluded that these items had "cost" and therefore "basis" to petitioner, since they had been paid for from petitioner's own unrestricted funds in which the cash contributions had been deposited without earmarking; as to the buildings transferred, the Court sustained the Commissioner on the ground that these transfers were not gifts and therefore the trans-

---

[6] The Commissioner does not deny that such deductions were disallowed for the first time in 1943, following the decision in *Detroit Edison Co.* v. *Commissioner,* 319 U. S. 98 (1943).

[7] The amount thus disallowed on account of depreciation was $22,472.60 for the fiscal year ended 1942 and $24,307.10 for the fiscal year ended 1943. There was no determination by the Commissioner of a deficiency in petitioner's normal tax for either year.

feror's basis was not available to petitioner. It held that the petitioner was in error in recording the contributions in equity invested capital as "contributions to capital" because only stockholders could make such contributions.[8] The Court of Appeals, reversing the Tax Court as to the allowance of depreciation deductions with respect to property acquired with cash, held that to the extent of the contributions there was no cost to petitioner.[9]

We think the assets transferred to petitioner by the community groups represented "contributions to capital" within the meaning of § 113 (a) (8) (B) and required no reduction in the depreciation basis of the properties acquired.[10] The values which the taxpayer received were additions to "capital" as that term has commonly been understood in both business and accounting practice; [11]

---

[8] The Tax Court relied at this point upon *McKay Products Corp.*, 9 T. C. 1082 (1947), which followed *Frank Holton & Co.*, 10 B. T. A. 1317 (1928) and *A. C. F. Gasoline Co.*, 6 B. T. A. 1337 (1927), decided under earlier excess profits tax laws, and *Liberty Mirror Works*, 3 T. C. 1018 (1944), involving I. R. C. § 718. The opinions in *Frank Holton & Co.* and *Liberty Mirror Works* regarded *LaBelle Iron Works* v. *United States*, 256 U. S. 377 (1921), as controlling.

[9] For this result the Court of Appeals cited *Detroit Edison Co.* v. *Commissioner*, 319 U. S. 98 (1943); *Commissioner* v. *Arundel-Brooks Concrete Corp.*, 152 F. 2d 225 (C. A. 4th Cir. 1945); and its own prior decision in *C. L. Downey Co.* v. *Commissioner*, 172 F. 2d 810 (C. A. 8th Cir. 1949). In affirming on the invested capital issue the Court of Appeals relied in part on *LaBelle Iron Works* v. *United States*, note 8 *supra*, and on the *Detroit Edison* case.

[10] See O'Meara, Contributions to Capital by Non-shareholders, 3 Tax L. Rev. 568, 572 (1948).

No suggestion is made by the Commissioner that because the transfers were the subject of contract they were not "contributions" within the statute.

[11] See, *e. g.*, Current Problems in Accounting—Proceedings of the Accounting Institute, 1941, p. 20 (Revised Statement by American Accounting Association of Accounting Principles underlying Corporate Financial Statements); Guthmann and Dougall, Corporate Financial Policy 525 (1940); Harvey, Some Indicia of Capital Transfers under the Federal Income Tax Laws, 37 Mich. L. Rev. 745, 747,

conformably with this usage the pertinent Treasury Regulations have consistently recognized that contributions to capital may originate with persons having no proprietary interest in the business.[12] That this interpretation is in harmony with broad congressional policy as to depreciation deductions was emphasized by the Third Circuit when considering the similar situation presented in *Commissioner* v. *McKay Products Corp., supra,* 178 F. 2d at 643:

> ". . . the assets received . . . are being used by the taxpayer in the operation of its business. They will in time wear out, and if [the taxpayer] is to continue in business, the physical plant must eventually be replaced. Looking as they do toward business continuity, the Internal Revenue Code's depreciation provisions—and especially those which provide for a substituted rather than a cost basis—would seem to envision allowance of a depreciation deduction in situations like this. . . ."

n. 6 (1939); Marple, Capital Surplus and Corporate Net Worth 12, 136–137 (1936). Cf. Magill, Taxable Income 389 (rev. ed., 1945); 1 Mertens, Law of Federal Income Taxation § 5.14 (1942); *Texas & Pac. R. Co.* v. *United States,* 286 U. S. 285, 289 (1932); *Lykes Bros. S. S. Co., Inc.,* 42 B. T. A. 1395, 1401 (1940), aff'd 126 F. 2d 725, 727 (C. A. 5th Cir. 1942); *Helvering* v. *Claiborne-Annapolis Ferry Co.,* 93 F. 2d 875, 876 (C. A. 4th Cir. 1938).

[12] Treas. Reg. 86, Art. 113 (a) (8)–1; Treas. Reg. 94, Art. 113 (a) (8)–1; Treas. Reg. 101, Art. 113 (a) (8)–1; Treas. Reg. 103, § 19.113 (a) (8)–1; and Treas. Reg. 111, § 29.113 (a) (8)–1 have read in part: "In respect of property acquired by a corporation after December 31, 1920, from a shareholder as paid-in surplus, *or from any person as a contribution to capital,* the basis of the property in the hands of the corporation is the basis which the property would have had in the hands of the transferor if the transfer had not been made. . . ." The provision of § 113 (a) (8) (B), Revenue Act of 1932, in which the term "contribution to capital" first appeared in federal revenue legislation, was reenacted without change in the Act of 1934 and, following the above interpretation in the regulations, in the Acts of 1936 and 1938 and in the Internal Revenue Code.

The Commissioner contends, however, that this conclusion was foreclosed by *Detroit Edison Co.* v. *Commissioner,* 319 U. S. 98 (1943). That decision denied inclusion in the base for depreciation of electric power lines the amount of payments received by the electric company for construction of the line extensions to the premises of applicants for service. It was held that to the extent of such payments the electric lines did not have cost to the taxpayer, and that such payments were neither gifts nor contributions to the taxpayer's capital. We do not consider that case controlling on the issue whether contributions to capital are involved here. Because in the *Detroit Edison* case "The payments were to the customer the price of the service," the Court concluded that "it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company." Since in this case there are neither customers nor payments for service, we may infer a different purpose in the transactions between petitioner and the community groups. The contributions to petitioner were provided by citizens of the respective communities who neither sought nor could have anticipated any direct service or recompense whatever, their only expectation being that such contributions might prove advantageous to the community at large. Under these circumstances the transfers manifested a definite purpose to enlarge the working capital of the company.[13]

---

[13] *Commissioner* v. *Arundel-Brooks Concrete Corp.,* 152 F. 2d 225 (C. A. 4th Cir. 1945), relied upon by the court below, involved only the issue whether the full cost of a concrete mixing plant, the construction of which was financed in part by payments from a nearby supplier of a raw material used in mixing concrete, was depreciable to the taxpayer; there was no "contribution to capital" issue, the only question being one of cost basis. However, the payments in that case were made in consideration of services rendered. The construction of the concrete plant directly benefited the supplier of raw materials by insuring the use of its sole product by the tax-

The assets transferred by the community groups are likewise contributions to petitioner's capital for the purpose of computing its invested capital credit.[14]  Cf. I. R. C. § 728.  Precisely the same interpretation has been placed by the relevant Treasury Regulations upon the term "contribution to capital" appearing in § 718 (a) as upon the like expression in the income tax provisions.[15]  That the excess profits tax provision characterizes capital contributions as being "invested" and "paid in" does not indicate, as the Commissioner urges, that the concept of capital is the constricted one of legal capital or capital originating with persons having a proprietary interest in the business; we think instead that the taxpayer's investment includes certain values which are properly "treated as his investment," cf. *Reisinger* v. *Commissioner,* 144 F. 2d 475, 477–478 (C. A. 2d Cir. 1944), though not having cost to the taxpayer.  Cf. I. R. C. § 723.  It would have been an oddity for Congress to make the inclusion of actual capital contributions in equity invested capital turn upon whether the transferor owned or failed to own one or two shares of stock in the corporation at the time of the transfer.[16]

The decision of this Court in *LaBelle Iron Works* v. *United States,* 256 U. S. 377 (1921), is not to the contrary.  That case was decided under the excess profits tax law of 1917 in which "invested capital" was defined

---

payer; the supplier was also served through a business affiliation with the parent of the wholly owned taxpayer in the form of an exclusive marketing arrangement which saved the supplier the expense of a sales organization.  See *Arundel-Brooks Concrete Corp.* v. *Commissioner,* 129 F. 2d 762 (C. A. 4th Cir. 1942).

[14] See Brewster, The Federal Excess Profits Tax 110–111 (1941).

[15] Treas. Reg. 109, § 30.718–1; Treas. Reg. 112, § 35.718–1.

The Commissioner agrees that the term "contribution to capital" is used with the same meaning in §§ 113 (a) (8) (B) and 718 (a).

[16] See 2 Montgomery's Federal Taxes—Corporations and Partnerships—1946–47, p. 372.

as "(1) Actual cash paid in, (2) the actual cash value of tangible property paid in other than cash, for stock or shares . . . at the time of such payment . . . and (3) paid in or earned surplus and undivided profits used or employed in the business . . . ." The Court held that neither unearned appreciation in value of the taxpayer's ore lands nor the surrender of old stock in exchange for new issues based upon that value, could be regarded as "the actual cash value of tangible property paid in other than cash" or as "paid in or earned surplus and undivided profits." The includability of contributions by outsiders in invested capital was not passed upon.[17]

To the extent that petitioner acquired property involved in this controversy after December 31, 1920, it is entitled to deductions on account of depreciation under § 113 (a) (8) (B). It also may include the value of the contributions from community groups in equity invested capital under § 718 (a) (1) and (2). The judgment of the Court of Appeals is reversed and the case remanded with directions to remand to the Tax Court for further proceedings in conformity with this opinion.

*Reversed.*

Mr. Justice Black agrees with the Court of Appeals and would affirm its judgment.

---

[17] In *Southern Pac. Co.* v. *Edwards*, 57 F. 2d 891 (S. D. N. Y. 1932), the court held that a capital donation originating with a non-stockholder was includable in invested capital as "paid-in surplus" under the 1917 Act. However, contributions to capital account from outsiders are often thought of as contributed or donated capital surplus rather than as paid-in surplus, see *e. g.,* Hoagland, Corporation Finance 555 (3d ed. 1947); we think that for this reason among others Congress added the term "contribution to capital" to the excess profits tax provisions of the 1940 Act, as it had to the Revenue Acts (§ 113 (a) (8)) since 1932, to indicate that contributions from outsiders intended as additions to capital should be included in the computation. See S. Rep. No. 665, 72d Cong., 1st Sess. 27–28 (1932); H. R. Rep. No. 1492, 72d Cong., 1st Sess. 13 (1932).