DOUGLAS HOTEL COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 4252, 20242.    Promulgated June 13, 1950.

*William J. Hotz, Esq.*, for the petitioner.
*Frank M. Cavanaugh, Esq.*, for the respondent.

OPINION.

LeMire, *Judge*: Our first question is whether the land which Brandeis deeded to petitioner as a site for the hotel is includible in petitioner's invested capital. This question is controlled by the recent decision of the United States Supreme Court in *Brown Shoe Co.* v. *Commissioner*, 339 U. S. 583. It was there held that property donated to a corporation by nonstockholders was includible in equity invested capital as a contribution to capital. On authority of that case we hold that the land deeded to petitioner by Brandeis for the hotel site in 1913 is includible in petitioner's equity invested capital as a contribution to capital under section 718 (a) (2), Internal Revenue Code.

Under section 718 (a) (2), Internal Revenue Code, property acquired by a corporation as a contribution to capital is to be included in equity invested capital "in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange." Under section 113 (a), Internal Revenue Code, the basis for determining gain or loss is cost, with certain exceptions, among which is that if the property was acquired by gift on or before December 31, 1920, the basis for gain or loss shall be the fair market value of such property at the time of acquisition.

The Commissioner's excess profits tax regulations (Regulations 112, sec. 35.718–1) provide that if the property was acquired prior to January 1, 1921, as paid-in surplus or as a contribution to capital, then "the basis is the fair market value of the property at the time it was paid in."

The respondent contends that the value at which the property is to be included, if at all, is not more than $125,000, the value which he determined for it in his notice of deficiency, while petitioner contends that it is not less than $246,275. The value contended for by petitioner is the amount at which the property was set up in its opening books. This book value represented the par value of the shares of common stock which petitioner claims it issued for the property. Petitioner's theory is that it acquired the property in exchange for its common stock, which at all times has had a value of par or greater.

The petitioner and the respondent seem to be in agreement that the property in question is to be included in petitioner's invested capital, if at all, at its fair market value when acquired by the petitioner. They disagree, however, as to when petitioner acquired the property. Petitioner contends that the date of acquisition was March 11, 1913,

when the deed was delivered to it and recorded, while respondent claims that it was about January 6, 1913, the date the deed was executed. We do not deem it necessary here to decide that question. The evidence is that the value of the property was about the same in March that it was in January and that there was no increase in value over that period, except as may have resulted from petitioner's intended use of it.

We think that the best evidence before us as to the value of the property in either January or March, 1913, is the price which Brandeis paid for it in an arm's length transaction in November, 1912. He paid $160,000 for the whole southern half of block 109, including lots 5 and 6, comprising the southwest corner of the block, and lots 7 and 8, comprising the southeast corner. The real estate agent who handled the transaction testified in this proceeding that the price of $160,000 represented the fair market value of the land at that time and that there was no appreciable change in its value up to the time petitioner acquired it, aside from its usage in connection with the proposed hotel. In the absence of any evidence to the contrary, we may assume that lots 7 and 8 had about the same value as lots 5 and 6.

Petitioner argues that the value which we must determine is the value of the land after the transfer and as a site for the hotel, taking into consideration the rental income to be derived from the lease of the entire property to Interstate Hotel Co. This lease had been entered into prior to March 11, 1913. The fair market value at a given date is what the property would bring in a free and open sale. The prospective return from the usage of the property by the petitioner might have a bearing on the market value of petitioner's stock, but that question is not before us here. We have found above that the property was not acquired in exchange for stock, but was a donation and contribution to capital. Therefore, the value of the stock, whatever that may have been, is no measure of the value of the property. We do not think that the petitioner's use of the property and the expected income from the lease are factors to be taken into consideration in determining its value at the time petitioner acquired it.

We think, and have so found above, that the value of the property at the time of its acquisition by petitioner was not in excess of $125,000, the amount at which the respondent included it in petitioner's invested capital in his notice of deficiency.

The next issue relates to respondent's reduction of petitioner's invested capital by the amount of $448,438.67, representing the cash withdrawals made by petitioner's president and sole stockholder after he acquired all of petitioner's stock in 1924. Respondent determined that these withdrawals were "not out of accumulated earnings and profits" within the meaning of section 718 (b) (1), Internal Revenue

Code, and that they therefore reduced petitioner's equity invested capital, as defined in section 718 (a).

Both parties base their arguments on this question on the assumption that all of the withdrawals in dispute were taken from a cash depreciation reserve which petitioner had established in prior years. In its 1942 excess profits tax return the petitioner voluntarily reduced its invested capital by the amount of $448,438.67, said to represent withdrawals from capital. Petitioner now claims, however, and has so alleged in its petition, that this was error and that the item should be restored to invested capital.

Depreciation or depletion reserves are generally regarded as partaking of the nature of capital, since they represent a portion of the cost of the assets used in the business. Therefore, distributions from such reserves have been held to constitute distributions of capital rather than of income. See *Creamette Co.*, 37 B. T. A. 216; *Ida I. McKinney*, 32 B. T. A. 450; affd., 87 Fed. (2d) 811; *John K. Beretta*, 1 T. C. 86; affd., 141 Fed. (2d) 452; certiorari denied, 323 U. S. 720. In the last named case we said that:

It is true, of course, that a distribution by a corporation to its stockholders of its depreciation reserve is not a taxable dividend and would be applied to a reduction in the cost basis of the stock. This is true because a depreciation reserve represents a return of capital. However, it must be borne in mind that under section 115 (b), *supra*, for the purposes of taxation effect, a corporation can not distribute to its stockholders its depreciation reserve as long as it has earnings and profits accumulated after February 28, 1913, sufficient to cover the distribution in question.

We conclude from the evidence before us that petitioner had no earnings and profits accumulated after February 28, 1913, out of which the distributions in question could have been made. It is shown that petitioner regularly distributed all of its earnings and profits by way of dividends. For all that the evidence shows, the depreciation reserves were properly claimed and allowed as deductions against petitioner's income of prior years and represented the actual exhaustion of petitioner's capital assets. There was never any claim by petitioner that the reserves were excessive or that any portion of them should have been restored to income either in the years when set up or in the years when distributed. See *Peabody Coal Co.*, 18 B. T. A. 1081; affd., 55 Fed. (2d) 7; *G. M. Standifer Construction Corporation*, 30 B. T. A. 184; *Creamette Co.*, *supra*.

Section 29.115–6 of Regulations 111 provides in part as follows:

Sec. 29.115–6. DISTRIBUTIONS FROM DEPLETION OR DEPRECIATION RESERVES.— A reserve set up out of gross income by a corporation and maintained for the purpose of making good any loss of capital assets on account of depletion or depreciation is not a part of surplus out of which ordinary dividends may be paid. A distribution made from a depletion or a depreciation reserve based upon the cost or other basis of the property will not be considered as having been

paid out of earnings or profits, but the amount thereof shall be applied against and reduce the cost or other basis of the stock upon which declared. If such a distribution is in excess of the basis, the excess shall be taxed as a gain from the sale or other disposition of property as provided in section 29.111–1. * * *

This or similar provisions have been carried in the Commissioner's regulations since 1918. See Regulations 45, art. 1549 (Revenue Act of 1918).

We think that the respondent correctly reduced petitioner's equity invested capital by the amount distributed from its depreciation reserves.

Finally, petitioner contends that it is exempt from excess profits tax under the provisions of section 727 (g) (2), Internal Revenue Code. Section 727 provides in part as follows:

SEC. 727. EXEMPT CORPORATIONS.

The following corporations, except a member of an affiliated group of corporations filing consolidated returns under section 141, shall be exempt from the tax imposed by this subchapter:

\*  \*  \*  \*  \*  \*  \*

(g) Domestic corporations satisfying the following conditions:

(1) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and

(2) If 50 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business.

Petitioner's position on this issue is wholly inexplicable. Although the statutory exemption is plainly based on the condition that 50 per cent or more of the gross income be derived from the active conduct of a trade or business, petitioner argues in its brief that it was *not* engaged in the active conduct of a business, but was merely collecting its rentals. We quote paragraphs 2 and 3 from page 55 of petitioner's opening brief:

2. The Douglas Hotel Company was not engaged in the active conduct of trade or business in 1942 or 1943. Whatever income it had was derived from a lease executed on January 2, 1924. The corporation did nothing else, according to the testimony of the witness Reed, from the beginning, and the witness Rothery, from 1924 to date, as heretofore explained. This point was properly raised in the pleadings and presented at the trial.

3. The petitioner submits that the applicable law exempts domestic corporations, such as the petitioner, from the excess profits tax as defined by Sec. 727 (g) (2), which states, "If 50 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business."

As to whether petitioner was or was not actively engaged in a trade or business during 1942 and 1943, we venture no opinion. However that may be, it is the plain meaning of section 727 (g) that both of the conditions prescribed under subsections (1) and (2) must be met;

that is, 95 per cent or more of the income for the preceding three years must have been derived from sources outside the United States.   Petitioner had no income other than from sources within the United States. It, therefore, has no possible claim to the exemption.

*Decisions will be entered under Rule 50.*