426 F.2d 417
 70-1 USTC P 9426
 FEDERATED DEPARTMENT STORES, INC., Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
FEDERATED DEPARTMENT STORES, INC., Petitioner-Cross-Appellee,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Cross-Appellant.
 Nos. 19820, 19821.
 United States Court of Appeals, Sixth Circuit.
 May 26, 1970.
 
 Robert A. Schulman and Lyman G. Friedman, Washington, D.C., Wenchel, Schulman & Manning, Washington, D.C., of counsel, for Federated Department Stores.
 William L. Goldman, Dept. of Justice, Washington, D.C., Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, William A. Friedlander, Dept. of Justice, Washington, D.C., on the brief, for Commissioner of Internal Revenue.
 Before McCREE and COMBS, Circuit Judges, and McALLISTER, Senior circuit judge.
 COMBS, Circuit Judge.
 
 
 1
 The Commissioner of Internal Revenue determined deficiencies in taxpayer's income tax for the fiscal years ending February 2, 1963 and February 1, 1964 in the amounts of $302,761.83 and $1,940,544.91, respectively. In an opinion reported at 51 T.C. 500, the Tax Court, on the basis of facts stipulated by the parties, redetermined those deficiencies to be $200,841.83 and $1,706,912.21 for the tax years in issue. Both the taxpayer, Federated Department Stores, Inc., and the Commissioner appeal from that decision. The pertinent facts and issues presented by those appeals are unrelated and therefore will be treated separately in this opinion.
 
 TAXPAYER'S APPEAL
 
 2
 Taxpayer owns and operates retail department stores in various cities throughout the United States. In the regular course of business, many of taxpayer's retail sales are made on credit. When installment credit is extended to a customer, a service charge is imposed by taxpayer based upon the purchase price of the merchandise, less any down payment, and the term over which the unpaid balance is to be paid. Should the customer pay the account in full prior to the expiration of this term, a pro rata part of the service charge is abated.
 
 
 3
 For income tax purposes, taxpayer, under the accrual basis of accounting, traditionally included in income at the time of sale the purchase price of all merchandise sold on credit. However, since the service charge was subject to abatement, it was not included in income at the time of sale but was credited to a deferred service charge account. The income from service charges was reported pursuant to a formula which taxpayer had applied in all its stores since 1950. Under this formula, part of the monthly payments received from customers was deemed allocable to service charges and included in income at that time. The service charge portion of an account receivable was therefore included in income ratably over the life of the account.
 
 
 4
 Between 1950 and 1964, agreements were executed with various banks under which taxpayer obtained in advance funds on the basis of its accounts receivable. The Tax Court found all the pre-1964 agreements to be 'substantially identical as to all material parts.' Taxpayer did not include in income the funds received under these agreements but continued to report as income the purchase price and service charge portions of its accounts receivable as it had prior to entering the agreements.
 
 
 5
 On February 1, 1964, the last day of its fiscal year, taxpayer entered into the transaction which forms the basis of the present appeal. On that date, taxpayer sold all its outstanding accounts receivable, except its 30-day accounts, to First National Bank of ChicagoB for $155,295,052.[1] This figure included deferred service charges of $2,831,782 which had not previously been reported as income but which had been included in the deferred service charge account. In accordance with past practice, taxpayer did not report the $2,831,782 in deferred service charges in income at the time the funds were obtained under the 1964 agreement with FNB. The Commissioner determined, however, that the deferred service charges must be included in income at the time of the sale to FNB. Taxpayer challenged this determination in the Tax Court, contending that it should be permitted to continue to report its income from service charges ratably over the life of the account as it had done under the pre-1964 agreements. The Tax Court ruled otherwise, and taxpayer does not question that ruling on appeal.
 
 
 6
 Taxpayer also contended in Tax Court, as it does on appeal, that if the deferred service charges were properly included in income at the time of the sale to FNB, then a change of accounting had been instituted by the Commissioner requiring certain adjustments in taxpayer's 1964 income. The Tax Court succinctly stated taxpayer's contentions in this respect as follows:
 
 
 7
 'A change of accounting must be with respect to a 'material item.' Section 481(a). Fundamentally, the item itself must be basically the same as an item previously accounted for with the present method of accounting differing from the prior treatment. Unless the transactions are basically the same, the accounting treatment would not be 'change' of accounting but only a 'new' accounting method for a different transaction. Thus, the issue is whether the pre-1964 transactions were in substance the same as the sale of the accounts on February 1, 1964, to FNB.'
 
 
 8
 From an analysis of the pre-1964 and the 1964 bank agreements, the Tax Court found that the 'bank transactions prior to 1964 differ so materially from the sale of accounts to FNB that no 'change of accounting' under section 481 was involved herein.' We agree.
 
 
 9
 The Tax Court carefully pinpointed and fully discussed the essential factors which distinguish the pre-1964 from the 1964 agreements. These include the taxpayer's own characterization of its accounts, the consideration paid by taxpayer under those agreements, and the extent of taxpayer's liability for defaulted accounts.
 
 
 10
 Taxpayer's Prior Construction of Its Agreements-- While construing the pre-1964 agreements as loans with the accounts receivable pledged as security, taxpayer characterized the 1964 agreement as a sale. In correspondence with the Internal Revenue Service, taxpayer represented with regard to the pre-1964 agreements that 'in substance Federated is the owner of all the accounts and takes the risk for all bad debts;' and that Federated 'pays to the banks an interest charge for the use of money secured from the banks.' By virtue of this representation, taxpayer was allowed a bad debt reserve in connection with the accounts receivable involved in the pre-1964 transactions. However, taxpayer later found it advantageous to change the nature of its financing agreements, and requested the Service to rule that the newly negotiated 1964 agreement contemplated a sale of accounts receivable. The Service so ruled, and taxpayer agreed that, since a sale had occurred, the balance in the reserve for bad debt account set up under the pre-1964 transactions must be restored to income in the year of the sale.
 
 
 11
 Cash Allowance to the Banks-- The manner in which the banks were compensated was indicative of a loan under the pre-1964 agreements and of a sale under the 1964 agreement. Under the pre-1964 agreements, the banks were committed to purchase, usually over a five-year period, all the accounts offered up to a maximum amount. On each monthly settlement date, taxpayer agreed to pay a commitment fee of 1/4 of one percent annually on the unused portion of that commitment. In addition, at the time of each purchase, taxpayer agreed to allow the bank a cash discount of 1/8 of one percent of the amount owing on the accounts. On each monthly settlement date thereafter, taxpayer agreed to pay the bank an amount which, when added to the original discount, would aggregate an amount approximating the current prime interest rate on the amount owing on accounts held for the preceding accounting period.
 
 
 12
 By contrast, the 1964 argeement did not provide for multiple transactions or contemplate regular payment of interest based on the amounts owing on the accounts. Rather, the 1964 agreement provided only for the sale of those accounts on hand on February 1, 1964. As consideration for its purchase of the accounts FNB received a cash discount of 2.037328 percent of the face amount of the accounts receivable purchased.
 
 
 13
 Liability for Defaulted Accounts-- The liability assumed by taxpayer for defaulted accounts varied considerably under the pre-1964 and the 1964 agreements. Under the pre-1964 agreements, ten percent of the face amount of the accounts was placed in a contract reserve to which delinquent accounts could be charged by the banks unless repurchased by taxpayer. If the reserve fell below ten percent, the banks could retain twenty percent of the accounts transferred in the future until the reserve again reached ten percent of the amount owing on all accounts. Significantly, in addition to this ten percent, the contract reserve contained an amount equal to 100 percent of the amount owing on all defaulted accounts. The obvious import of this provision was reflected in taxpayer's correspondence with the Internal Revenue Service which stated that taxpayer was fully responsible for all bad debts.
 
 
 14
 In comparison, the 1964 agreement expressly provides that taxpayer did not guarantee collection of the accounts sold. As in the pre-1964 agreements, ten percent of the sales price of the accounts sold are placed in a contract reserve to which delinquent accounts may be charged if not repurchased by taxpayer. There the similarity ends. As collections are made and remitted to FNB, the contract reserve is correspondingly reduced so as not to exceed ten percent of the uncollected accounts or two percent of the accounts originally sold, whichever is the greater. Beyond this, the only provision relating to liability is that which allows the bank to charge against the contract reserve as liquidated damages 0.375 percent of the excess of the amount invested by FNB in the accounts over that which was initially contemplated.
 
 
 15
 The foregoing summarization demonstrates substantial differences between the pre-1964 and the 1964 agreements. Taxpayer has consistently maintained that the key issue on this appeal is whether the pre-1964 transactions were in substance the same as the sale of the accounts to FNB in 1964. The Tax Court found that these agreements differed in significant respects. The findings of the Tax Court and factual inferences drawn from undisputed facts must stand unless clearly erroneous. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); I.R.C. 7482(a). The Tax Court's findings are supported by the record and certainly are not clearly erroneous.
 
 COMMISSIONER'S APPEAL
 
 16
 The Commissioner's cross-appeal involves the treatment to be accorded certain payments made to taxpayer in the fiscal years 1963 and 1964 by the Sharpstown Realty Company. Sharpstown owned a 2500-acre tract of unimproved land in Houston, Texas, on 115 acres of which it contemplated constructing a shopping center with the remainder to be devoted to residential and commercial purposes. Sharpstown was of the view that its venture would be more successful if taxpayer would construct and operate a department store in the shopping center. As inducement, Sharpstown offered to convey ten acres in its shopping center area to taxpayer and also to pay taxpayer $200,000 per year for ten years. The agreement was executed and taxpayer constructed a department store in the shopping center at a cost of $1,956,339. Neither taxpayer nor its shareholders owned an interest in Sharpstown; neither Sharpstown nor its shareholders owned an interest in taxpayer.
 
 
 17
 In the fiscal years 1963 and 1964, taxpayer received payments from Sharpstown of $200,000 and $400,000, respectively. The Commissioner included these amounts in taxpayer's income for the years in question. The Tax Court, however, held these payments excludable from taxpayer's income under Section 118 of the Internal Revenue Code, 26 U.S.C. 118(a). That section provides: 'In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer.' This resulted in a reduction in the deficiencies originally assessed by the Commissioner, and it is from this holding by the Tax Court that the Commissioner appeals.
 
 
 18
 The narrow question presented is whether the payments received by taxpayer from Sharpstown were contributions to taxpayer's capital within the purview of Section 118. We agree with the Tax Court that they were.
 
 
 19
 The Commissioner argues that Section 118 cannot be used to exclude from taxpayer's income the payments in question because (1) the payments were motivated by Sharpstown's own financial interests rather than by concern for the general welfare of the community; and (2) Sharpstown is not a governmental unit or civic group which allegedly is a pre-requisite to the applicability of Section 118.
 
 
 20
 The Senate Finance Committee Report (83rd Cong., 2d Sess., S.Rept. No. 1622 (1954)), contains the following comment on the purpose of Section 118:
 
 
 21
 '(Section 118) deals with cases where a contribution is made to a corporation by a governmental unit, chamber of commerce, or other association of individuals having no proprietary interest in the corporation. In many such cases because the contributor expects to derive indirect benefits, the contribution cannot be called a gift; yet the anticipated future benefits may also be so intangible as to not warrant treating the contribution as a payment for future services.' U.S.Code Cong. & Admin.News 1954, p. 4648.
 
 
 22
 Treasury Regulation Section 1.118-1 also provides that Section 118 does not apply to any money or property transferred to a corporation in consideration for goods or services to be rendered.
 
 
 23
 The payments by Sharpstown to taxpayer were admittedly made with the expectation that the existence of taxpayer's department store would promote Sharpstown's financial interests. However, this expectation was clearly of such a speculative nature that any benefit necessarily must be regarded as indirect. In all the cases relied on by the government, the contributions had a reasonable nexus with the services which it was the business of the recipient corporation to provide. Such is not this case. Under these circumstances, we agree with the Tax Court that any benefit expected to be derived by Sharpstown was so intangible as not to warrant treating its contribution as a payment to taxpayer for future services.
 
 
 24
 In a somewhat different factual setting, the Supreme Court has held that contributions received to induce a taxpayer to locate factories in a certain area are contributions to capital. Brown Shoe Co. v. Commissioner of Internal Revenue, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081 (1950). Although Brown Shoe Co. was decided before the enactment of Section 118, the legislative history of Section 118 makes it clear that it restates existing law as developed through administrative and court decisions. 3 U.S.Code Cong. & Ad.News 1954, p. 4825 (1954).
 
 
 25
 We do not agree with the Commissioner's assertion that Section 118 has no application unless the contribution is made by a governmental unit or civic group. The Senate Report referred to herein expressly states that Section 118 is also to apply to contributions made to a corporation by an association of individuals having no proprietary interest in the corporation. Our conclusion is not inconsistent with Treasury Regulation Section 1.118-1 as is contended by the Commissioner. In pertinent part, that regulation provides:
 
 
 26
 'Section 118 also applies to contributions to capital made by persons other than shareholders. For example, the exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or civic group for the purpose of inducing the corporation to locate its business in a particular community. * * *'
 
 
 27
 The reference in the regulation to a governmental unit or civic group obviously is only one example of the applicability of Section 118 to a contribution made by a nonshareholder, and by express language is not intended to be exclusive of other possible applications.
 
 
 28
 The judgment of the Tax Court is affirmed.
 
 
 
 [1]
 Both the taxpayer and the Commissioner stipulated that the 1964 transaction was a sale, and the Tax Court so found