**UNITED STATES of America,**
**Appellant,**

v.

**BROWN WOOD PRESERVING COM-**
**PANY et al., Appellees.**

**No. 13803.**

United States Court of Appeals
Sixth Circuit.

March 7, 1960.

John J. Pajak, Dept. of Justice, Wash-
ington, D. C. (Charles K. Rice, Lee A.

Jackson, Harry Baum and Marvin W. Weinstein, Washington, D. C., J. Leonard Walker and Charles M. Allen, U. S. Attys., Louisville, Ky., on the brief), for appellant.

Bernard H. Barnett, Louisville, Ky. (S. L. Greenebaum, Bernard H. Barnett and Charles F. Wood, of Greenebaum, Barnett, Wood & Doll, Louisville, Ky., on the brief), for appellees.

Before McALLISTER, Chief Judge, nd MARTIN and WEICK, Circuit ⸢udges.

WEICK, Circuit Judge.

The sole question in this appeal is whether income received under one year leases granting the right to turpentine timber qualifies for capital gains treatment as received for the "disposal of timber" within the meaning of Section 117(k) (2) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(k) (1).[1]

The District Judge held that it did. He adopted the theory advanced by taxpayers that turpentine is an integral part of the tree;[2] that if the taxpayer had sold the entire tree the income therefrom would be taxable as a capital gain; that if the taxpayer elects to first dispose of the turpentine and later the remaining wood products the aggregate of the receipts represents the sale price of the timber and any gain realized from the sale of the aggregate is taxable as a capital gain. Judgment was rendered against the Government for an amount equal to the difference in the tax on the

proceeds as ordinary income and capital gains, taxpayers having been assessed, and having paid the higher amount.

It is the claim of the Government that "turpentine" cannot be equated with "timber" as that word is used in the statute; that the legislative history of the statute does not justify any such interpretation; that the statute, being an exception to the general rule that income is taxable as ordinary income, should be narrowly construed.

Some of the facts were stipulated in the District Court and oral testimony was taken.

Four leases, executed in 1949, are involved.[3] Appellees were the lessors. Each lease was for the term of one year. The leases were orally extended and were in force for the additional years 1950, 1951 and 1952. The payment due the lessors was a specified percentage of the gross turpentine operations.[4] The amount of income during the four tax years in question is not in dispute. The timber which was the subject of the leases, had been purchased by the lessors more than six months prior to the execution of the leases.

The resin is obtained by cutting a portion of the outer and inner bark of the tree and then chipping. Sometimes acid is used in lieu of chipping to facilitate the flow of sap. The cuts are referred to as faces. They start at the base of the tree and are about 12″ to 14″ wide and 16″ high. Cups are fastened to the tree to catch the sap. The sap is removed during the spring and summer. Each

---

1. "(2) In the case of the disposal of timber coal (including lignite), held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber or coal, the difference between the amount received for such timber or coal and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber or coal."

2. Actually, turpentine is not a component of the tree. Turpentine is distilled from

resin, which is the sap of the pine tree. However, throughout this case both sides have used the word "turpentine" instead of "resin". For the purposes of this opinion that usage will be continued.

3. The Crabtree lease was executed on November 30, 1949 and was to be effective for the year 1950. It was orally extended for 1951 and 1952. An oral agreement embodying the same terms was in effect for 1949.

4. Three leases provided for a percentage of 25% and one for 22½%.

year it is necessary to cut a new "face" on the tree about the same size, but above the previous one. The operation is usually repeated for three or four years, sometimes up to ten years in larger trees. Then faces are cut on other sides of the tree. Some trees have been "turpentined" for as long as twenty years. Where the cutting has been only on one side of a tree, it may be used to make poles.

Turpentining a tree does affect the value of the lumber after perhaps the first year. It retards the growth of the tree. Insects sometimes go in the tree at the open faces. The sap is flammable and if the tree and the surrounding area are not kept clean, damage from fire might result. Pitch streaks develop in the area of the faces and work upward.

It should be pointed out, however, that a depletion allowance of about 30% was allowed to the taxpayers.[5] There was no evidence that the damage to the trees caused by turpentining exceeded the amount of this allowance.

█ The all important question in this case is the meaning of the phrase "disposal of timber" found in Section 117(k) (2). It is proper to refer to the legislative history to aid in determining that issue. New York Life Ins. Co. v. Bowers, 283 U.S. 242, 51 S.Ct. 399, 75 L.Ed. 1005.

Of the greatest significance in the history is the over-all picture, rather than any single segment. The committee reports[6] and statements at the hearings on the bill[7] show that this legislation was enacted to alleviate a particular problem.

In 1943, the timber owner who cut his own timber prior to sale, or had another cut it for him, was taxed on the proceeds as ordinary income, whereas if the timber had been sold standing the proceeds would have been treated as capital gains. Cf. Commissioner of Internal Revenue v. Boeing, 9 Cir., 106 F.2d 305.

No lengthy explanation is necessary to show the hardship this worked on the timber owner. Over a long period of years the trees on his tract matured until they reached the point where they could be cut. During those years his operating expenses kept running. When the trees were cut and sold the income tax on the proceeds as ordinary income left the operator with but a small fraction of the income, particularly if his operations were substantial, putting him in a high tax bracket. The income had to be reported in the year in which the trees were sold and could not be spread over the years of their growth.

There was little inducement for the operator to cut his timber if he could retain only a small portion of the proceeds of sale.

The timber operator was left with three choices. First, he could cut and sell his timber, pay the tax and realize little profit. Second, he could sell his property outright, or the standing timber alone, and obtain capital gains treatment on his profits. Third, he could simply not sell at all and maintain his holdings. These alternatives created problems for the operator. The third one created a problem of national importance.

At the time this legislation was being considered the country was in the midst of World War II, and wood and paper products were vital to the war effort. The refusal of the timber owners to cut their timber could only result in a shortage of such commodities. If the timber operator was unable to obtain a reasonable profit he would not be likely to plant additional trees. The result of that would be a slow-down in reforestation, which would not only hamper the war

5. Section 23(m), Internal Revenue Code of 1939, 26 U.S.C.A. § 23(m).

6. S.Rep. No. 627, 78th Cong., 1st Sess.; H.Conf.Rep. No. 1079, 78th Cong., 2d Sess.

7. Senate Hearings, Revenue Act of 1943, pp. 490 et seq., 660 et seq., 667 et seq.; House Hearings, Revenue Revision of 1943, pp. 840 et seq.

effort, but also increase the difficulties of a successful post-war recovery.

■ From this background Section 117(k) emerged. Its purpose is obvious. It was intended to promote a continuing timber industry by giving a tax benefit to the timber operator in the year in which he realized the fruits of many years of labor, no matter in what manner he sold his trees. It was, in the truest sense, intended to relieve against an excessive tax burden.

In turpentining a continuous operation is carried on. The income is derived year by year, and fluctuates only with reference to the volume produced and the market price. There is no excessive tax burden in any one year. Accordingly, there is no necessity for special tax relief in order to make the over-all operation profitable.

■ Section 117(k) was enacted in light of, and to overcome, a definite problem. Its extension into areas where that problem does not exist is unwarranted.

Were there some indication in the legislative history that the phrase "disposal of timber" or the word "timber" was intended to apply to turpentining it might counterbalance the fact that the turpentining operation does not comport with the economic theory of Section 117 (k). There is no such indication in plain language. To the contrary, the word "timber" appears to have been intended to carry the meaning which the general public attaches to it—a tree or stand of trees.[8] Nowhere is timber equated with turpentine.

In both the House Conference Report and Senate Report the word "timber" is used many times, with no indication that it was intended to have any meaning other than its ordinary one.

The Treasury Department has not equated "timber" with its components either.

In Income Tax Release No. 1—Turpentine Depletion (dated Dec. 28, 1949) it was stated:

"In circumstances which require the determination of fair market value as of any given date, the value of the timber should be first determined. Of the value so determined, a reasonable amount may be allocated to the turpentine * * *."

Revenue Ruling 56–434, IRB 56–36, discussed the tax consequences of amounts received by a timber owner from pulpwood extracted from the tops and limbs of trees felled for sawlogs. It was held that:

"Section 631(b)[9] benefits apply only with respect to the standing trees cut by the contractor and not to the pulpwood cut by the contractor from the tops and limbs of the trees felled by the taxpayer, since in the latter case there has not been a disposal of standing trees (timber)."

In both instances the term "timber" was restricted to standing trees, and not the several components thereof. This interpretation appears on the face of the Revenue Ruling, while in the Information Release the valuation of turpentine, the component, is arrived at only after the timber is given its total valuation.

■ The words of a tax statute should, if possible, be interpreted in their ordinary everyday senses. Crane v. Commissioner, 331 U.S. 1, 6, 67 S.Ct. 1047, 91 L.Ed. 1301. In common parlance the word "timber" is not ordinarily understood to mean "turpentine".[10]

---

8. Webster's New International Dictionary (2nd ed.) defines timber as: (2b) Wood suitable for building houses, bridges, ships, etc. whether on the tree or cut and seasoned. (4) Land covered by trees from which timber (sense 2b) is produced; forest; wood; trees collectively; also, a tree or its bole [trunk].

9. Section 631(b) of Internal Revenue Code of 1954, 26 U.S.C.A. § 631(b) is substantially the same as Section 117(k) (2) of the 1939 Code.

10. It has been stated, "If sap in a tree which is replenished recurrently is timber then what about pecans and hickory

Similarly, the phrase "disposal of timber" ordinarily means a true disposal by means of severance of standing trees.

In executing the one year leases of rights to turpentine timber, this did not operate as a "disposal of timber" within the meaning of Section 117(k)(2) of the Internal Revenue Code of 1939. At the end of the leases and of each renewal thereof the trees were alive and still standing. They had not been disposed of and they had value. When the short term leases expired the lessors had more than an economic interest in the timber. They were the sole owners. They had been compensated for the turpentining and had received tax benefits for depletion. They still had the trees. If Congress had intended to extend capital gains treatment to products derived from the sap of a standing tree, it would certainly have used more appropriate language than "disposal of timber".

Capital gains is an exception to the general rule that income is taxable as ordinary income. Section 117(k) gives a double benefit in that it provides for capital gains—ordinary loss treatment. Accordingly, the statute is not to be broadly applied but is narrowly construed in order to protect the revenue. Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 265, 78 S.Ct. 691, 2 L.Ed.2d 743; Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29; Burnet v. Harmel, 287 U.S. 103, 106, 53 S.Ct. 74, 77 L.Ed. 199.

The argument presented by taxpayers is not without force, but must be presented to the Congress. We are not willing to extend the statute beyond its intended scope.

The judgment of the District Court is reversed and the cause is remanded with instructions to enter judgment in favor of appellant dismissing the complaint.

nuts?" Briggs, The Timber Owner and His Tax Expert Plan to Ensure Capital

Gains, The Journal of Taxation, April 1959, p. 238.